Counsel, is it your understanding under the Covenant that the patentee has the right to sue you if you reintroduce the exact same product that he had sued you on this time? Absolutely. Seems to me that's the critical distinguishing feature in this case between SuperSac and this one, isn't it? Agreed, because in SuperSac, Your Honor, the Covenant allowed the defendant to continue manufacturing either the past or the current products. The issue in SuperSac was the defendant said, hey, wait a minute, what if I sometime in the future decide to introduce some new products? The Covenant doesn't cover that. The Covenant in SuperSac was somewhat of a moving target, which is why I think there's a little bit of confusion here in this case, because if you noticed, one of the critical features in SuperSac, which isn't very helpful if you don't have access to the oral argument, is that the court said, based on the Covenant and representations about the Covenant made during oral argument, we find that this particular Covenant is one in which they are agreeing not to sue into the future on the products that have been the subject of the sue. And the key thing is that all came up in oral argument. The Covenant itself is more ambiguous. And actually, since it wasn't so much of a written document rather than attorney statements and briefs and representations orally, it became hard. But did you have a chance to listen to the SuperSac oral argument? I'm assuming you're going to tell me now. I confess, Your Honor, I did not. But it was clear to me in reading the decision that the upshot of the SuperSac Covenant, whether it was in writing or a combination of writing and oral argument, was that the defendant still had the ability to stay on the market. Because what the court said was, under the terms of the Covenant, as they construed based on whatever it needed to construe it, the defendant didn't have to worry about being sued in the future on those products. I get it from the oral argument. And I actually transcribed it, because you can only now find it on a cassette tape. So if you don't have a tape deck, you're in trouble. It's not on the internet like our normal ones now. And it's crystal clear from that SuperSac oral argument that you're exactly right, that that attorney swore up and down and said, I'd be stopped and in all kinds of trouble, that any of the products that were the subject of this lawsuit, any of the products which they were making, using, or selling prior to this date, and any of the products that were the subject of this lawsuit, are now forever free and clear. That's correct. And so it seems like it's a, if you're right and he doesn't stand up and tell me we're making the same assertion in our covenant, then it seems like a pretty critical difference between your case as well. And if counsel makes that assertion, that we can be on the market, I'll turn around and get on an earlier train, Your Honor. But both in the district court and in my papers here, I believe I mentioned several times that this covenant is no covenant, because it precludes market entry. The day we introduce the product that's subject to the covenant, we will be sued. Revolution never disputed that. They never said, oh, no, you can make these products. And that's why, Your Honor, I suppose. It also seems you're getting a short end of the stick. Your client did something that I think was actually rather gratuitous and entirely appropriate, which is out of concern for infringement, potential willful infringement. He pulled the products off the market. Well, if he had left the products on under this covenant, he'd now be able to keep making them, right? But the fact that he pulled them off seems to be almost to his detriment in this case. Well, that's right. And I'd also consider my client's action is more than gratuitous. I consider them admirable. And here's the choice that the district court has left us with by dismissing our counterclaims. We either have to reintroduce the product, subject ourselves to damages to the degree that Revolution thinks it's financially worthwhile to risk this patent over trial, or give up our right to manufacture bottom-outed eyewear. We say we have the right because we believe the patent is invalid, unenforceable, and non-infringed. The case was on the courthouse steps. We were ready to go to trial. The pre-trial order was filed. The jury instructions were filed. We were ready. We were ready to go. And unfortunately, Judge Gutierrez, who I have a lot of respect for, misread Supersac and misread the covenant. Well, to be honest with you, I wouldn't fault him too much. It took listening to the oral argument for me to be convinced. And that's the tough thing about opinions that say, based on representations and oral argument, we conclude. So don't fault him too much. It took quite a bit for me to come around on that point as well. I'm not, Your Honor. And I really believe we satisfy these standards of menu. We have a product on the market that wouldn't have been a lawsuit if we didn't. We can get the product back on the market within 60 days. This is not a complicated machine or a complicated process that requires some government approval. It's a pair of eyeglasses. Well, that's entirely the problem, isn't it? You have a covenant on its face. I'm going to say I didn't listen to the argument for the district court. What's binding are the documents that were entered into the record. So here, when your opponent says, I agree, there could be no damages. There would be no action for past infringement. The question is a very interesting one, whether metamune goes so far as to get an advisory opinion where there's no infringement. You really have to make sure that it's squeezed into the Supreme Court's conversation. In metamune, there has to be a real and present danger. An issue that supports jurisdiction when there's no actual controversy. A highly likely future controversy. Well, Your Honor, I believe there is a controversy. Metamune talks in terms of immediacy and reality. Under all the facts and circumstances, we have a product on the market. The only thing that's preventing us from re-entry is this patent that they're holding over our head. Think of this potential scenario. If the district court is right to reintroduce the product enough to establish jurisdiction, they sue us. We take the product off the market, add an abundance of caution like we did the first time, which we have every right to do. Then we get a covenant because there's no damages. They say, we won't try to collect damages for the five frames that you sold. And the district court says, okay, case dismissed. We're on a merry-go-round, we can't get off. It's a merry-go-round of tactics in the relationships. But the question is, at what stage does that put us under Article III? You're at that stage of honor because what Metamune says is the patent has to take some affirmative steps. It needs to be defended. There has to be conflict in positions. There are. Revolution says that we infringe this patent, the products that are subject to the government. We say we don't. We say the patent's no good. We say it's invalid. We say it's under-enforced. That's enough. Do we really have to reintroduce the product tomorrow and get sued again just so they can dismiss the case? Drawing the lines, certainly if you didn't have this history, but just had an intention, an interest in entering into the market with a product that more likely than not, or at least arguably they infringe or is close enough so that they can bring an action. We know that that isn't enough under Metamune. To say I'd really like to enter the market with this product on which they may sue me. Counsel, isn't it the case that the Vice President of Aspects said in his declaration that we intend to, and I understood it to be, and tell me if I'm wrong, reintroduce the same product that we were selling that they already sued us on? Yes, Your Honor. Is that his question? Yes. The accused product. And if you want to find the exact appendix sites, he said it twice. A252 and A314. Now, bearing in mind, Your Honor, that... Can I take it back to the question? Yes, Your Honor. I'm sorry. If I remember your question, if I have it in mind. We're not talking about, Your Honor, a situation where we're saying, well, he may sometime down the road, hypothetically, want to design some bottom-up product. We really want to get into the market with this product. We've got thousands of them in the warehouse. We can go, yes, in 30 to 60 days. Do you think that would be enough for a pre-judgment? Absolutely. You haven't sold any? We have sold them. That's why the lawsuit started. You are exonerated for all possible past infringement. The plain reading, whatever else one reads into the covenant, as far as past damages are concerned, that's behind. Now the question is, if, in fact, you have a very strong interest and capability of entering the market with an infringing product, in your view, that's enough? Yes, considering all the facts and circumstances of this case, which include the nature of the covenants, which include the fact that they sued us. That wasn't my hypothetical. It sort of straddled us without history. Okay, without history, under those specific facts that you gave, and nothing else, yes, there is article three jurisdiction. That clearly is enough. Yes. That a strong interest in entering the market with an infringing product, I think is enough under minimum. With a product that already has been marketed, yes. See, your strong interest hypothetical, Your Honor. But I'm trying to understand the qualifications. I'm really trying to understand the poles of this issue. You're saying that it has to be something that you had on the market and pulled off and now want to come back with? Those are these facts. I'm not saying that in every case that just a strong interest and nothing else would give you jurisdiction. I'm talking about this case. A strong interest where you've never made the product, where you have no plans, where you have – that would be the situation in Supersan where the defendant said, well, wait a minute. Well, that was before Meta knew. I'm trying to understand now how – we know Meta knew and made a lot of changes. I'm trying to understand how whatever changes it made impacted you. And I gather from what you keep trying to tell me, except I keep interrupting you, is that on the particular facts of this case, it's easier than if the facts were a little bit less. It is easier under the facts of this case. And, Your Honor, Meta knew and says we have to consider all the facts and circumstances of the particular case. I don't think we can establish many right-line rules. I just have one question, if I could. Yes, Your Honor. I just want to make sure I understand the covenant that we're discussing here and that's at issue and that formed the basis for the district court decision. Am I correct in understanding that it's reflected at A43 of the appendix in Mr. Trojan's email to you? Is that the essence of the covenant that begins, Dear Mr. Nicodemus? Yes, that's from Mr. Dang to me. Oh, I'm sorry. It was Mr. Dang of the Trojan Law Offices. Okay. Right. It says, based upon any activities under a products made, used, or sold on her before the dismissal of this action. Right. So, in other words, I just want to understand and make sure I'm in the correct place on the record. That is the document where the covenant that formed the basis for the district court decision is found. That's it. Okay. That's it. There's no other document or agreement or anything like that? No. Okay. And it's clear that is what Revolution meant by this was you can market the products that you have on the market and pull off when the lawsuit started. Like I said to Judge Moore, we wouldn't be here. But that isn't what it means. They want a self-imposed injunction on us, and it's clear from the 506 covenant that that's what they meant. They originally agreed to dismiss the case if we wouldn't reenter the market with bottom-mounted items. That's what they want. They don't want us on the market. We want to be on the market. The only thing that's preventing us is this patent. So, under Meta New, the district court should let our counterclaims go to trial. Okay. Let's hear from the other side. Mr. Trojan. Please, the court. Mr. Joseph Trojan, Counsel, Forbes. So, tell me what the covenant intends. The covenant does not cover future introduction of the same product. Okay. So, it's clear that this case does differ from SuperSec in that way. Now that we've... Those are available, just so you know, to the public. You can call our clerk's office, and they send you copies. So, Mr. Trojan, you're saying that if Mr. Nicodemus' client introduces the product that was alleged to previously infringe in the future, your client can sue him for infringement. That's correct. Possibly on a different patent. I may not sue him on the same patent. It's speculation. We have a whole portfolio of bottom-mounted patents. And so, it may indeed be that for the next case, it will not involve this particular patent. And why in the world, to get out from under this, don't you just make a covenant and say, we won't sue on the patent that issued this suit any future... any product that was the same one that was subject to the previous suit? It seems like that gets you out under SuperSec. If you've got other patents you can sue them on, it doesn't take those off the table, that they weren't the subject of this litigation. That's correct, but without the benefit of that little argument. Well, you know, it's not too late. You're standing here right now. But then I would need to review the claims and all the patent portfolio to make that kind of determination to tell the jury. And so that... And so the argument that with this threat and with this history, that this is something that Ed and you wanted to open the door to, that the district court didn't think so. But there is a... It isn't quite the same, it's just being estranged to the issue. That's why I think it's important to read exactly what is in the Equipment Declaration. It says, quote, and this is from A81 of the appendix. 81? 81. Aspects has the capability to introduce the accused bottom-mounted eyewear into the marketplace within a few months. Based upon my knowledge in regards to the manufacturer's capability and the lead time required to produce bottom-mounted eyewear, aspects could be in the marketplace within 60 days. From a business standpoint, it would certainly be profitable to aspects to reintroduce its bottom-mounted eyewear into the marketplace. So it says he has the capability and it would be profitable, but it doesn't go and say he has concrete plans to do so. Okay, hold on. I'm paging. I can't keep track. It seems like there are three or four different declarations by this person. All right. What about the one on A252? In that one, the same gentleman says, Aspects is ready to resume the sale of the accused eyewear. This seems much more concrete than the one you're pointing at, which is why I'm directing you to it. Aspects is ready to resume the sale of the accused eyewear as soon as favorable decision is rendered in the pending action. Aspects has always intended and intends to resume activity in this market. That one is more concrete. Certainly the one you pointed to opens the door to a little more speculative argument. You know, it's speculative. They're not saying they're going to do it. They're saying that they possibly have the capacity to. But the one on A252 seems a lot more concrete. They say they intend to do it as soon as this decision is reached. Right. And we were reading them in conjunction. I mean, certainly that says that he intends. That one does say he intends to do it. I would have to go back and look at that. If that particular declaration was in response to the order of the clarification. It says it was in support of, it was in opposition to the motion to dismiss. Right. And we're saying that we really want to do this and therefore let us have our day in court. Correct, but I don't think that it still represents a concrete indication that they're taking. Usually when you're going to say what you're doing, you go and say, okay, these are the concrete plans that we're making. We have come up with designs. We have such and such manufacturer that we're talking to. We've determined what the pricing is. We've gone through the entire process. But if they're simply reintroducing the exact same frames that they were selling when we sold them, and that's what they're saying in A252 they're going to do, do we really need all that? We know they know how to design. They already had them on the market just at the beginning of this lawsuit. So there's no doubt the design plan exists. There's no doubt manufacturing exists. So all those things aren't in dispute when they're reintroducing the identical. I mean, if you certainly raised some issue that suggested they no longer have the capacity to manufacture them or something, that would be different, but when it's reintroducing the exact same things and they say that we're ready to do it, we're going to have them on the market within 60 days, doesn't that sort of negate the need for the kind of stuff you're describing, which it seems to me is absolutely correct under the law when they're talking about introducing a new product? Well, then that would raise the specter that any large company in particular that specializes in a particular product, they're always going to have that capability to manufacture the competitor's product. I don't think there's any example. I mean, you could even say that for things as complicated as pharmaceuticals. A pharmaceutical company knows how to manufacture pharmaceuticals. Couldn't we draw that line as a legal matter pretty clearly? Well, I guess that as a practical matter, we know that Aspex sells top-mounted eyewear. That's what it has its patents on. And the idea that, and this court's quite experienced with Aspex's top-mounted eyewear. It's had many cases before from Aspex. And so that's what it really sells. But it must have sold bottom-mounted because you sued them on it. That's correct. And the reason why the case went away is because they sold just enough to precipitate the lawsuit and then stopped selling it. The sales were insignificant. So just the original lawsuit was filed believing that, and in fact, all they were trying to do was precipitate the lawsuit by selling just enough to get the lawsuit going. And then what happened? Then they immediately stopped selling. So they've been wanting to attack, their strategy is to attack the patents of the revolution as a competitor. They had no means of doing that other than through re-examination. Don't you think their strategy is to compete in the bottom-mounted eyewear market? I mean, why would they? Isn't that their strategy? I mean, they sold the products and they're telling us they intend to sell them again and they want to compete. Well, I disagree with the characterization that there's a bottom-mounted eyewear market. Okay, I'm misstating the product. I'm sorry. There's a magnetic eyewear market in which Aspex is the major player and they have their patents on top-mounted. If they believe outside of a real dispute that our patents are invalid, they can offer re-examination of those patents. And that would be the administrative remedy that's available to them outside of the lawsuit. But certainly, if they were to begin selling bottom-mounted in the same way that they did it before, just to precipitate a lawsuit, I think that we would be very cautious about whether we would be drawn into that again, just for the sake of, for them to try to create article 3 jurisdiction. And so, once again, I think in this process of whether there would definitely be a controversy, whether we would sue on the same patent is an open question. And so, it still takes into consideration whether there's a dispute between the parties. While we have said we're not going to sue on anything in the past, and we're completely waiving that, we did not say we would automatically sue in the future. It's still this speculative advisory opinion. As you're looking at that opinion, it says, basically, the question in each case is whether the facts alleged under all the circumstances show that there's a substantial controversy, etc. It goes on from there. I'm sure you're familiar with that. Now, you've indicated here today, in response to Judge Moore's question, sort of a motivation for aspects to sue to get this, you know, thing going so that they can attack your patents, your appliance patents. And maybe Mr. Nicodemo would disagree with that motivation. But in any event, the point of it is that when looking at the circumstances of this case, as many of you tell us we have to, it does seem that there's a history here of conflict. And that seems to be a significant factor, whatever the motivation is. I mean, the bottom line is, as Judge Moore suggested, they do want to get on the market and compete and sell. Now, you may disagree with the strategy as to how they get there. But it does seem that the circumstances of this case suggest conflict and a real dispute between the parties. We're not on a clean slate. We're not on a clean slate, but with respect to Revolution's patents, this is the, with respect to this patent, this is the one lawsuit. So yeah, but that's, there's a lawsuit there. Correct. I mean, they have a product, you sue them, you file it for an interest, that's fair enough. So, I mean, and they want to put the same product out on the market. So, I mean, that does suggest overall circumstances opposing interests that would seem to bring you within the somewhat generous language of Metamine. Well, it seems that Metamine still wants to see some sort of concrete steps that's going to precipitate bringing them to Article 3. So, because obviously there's many, I think if you look at any industry, the major players are frequently suing each other on patents all the time. If that's the criteria, that there's litigious history between the parties, that's going, that seems to suggest that Article 3 is going to be opened up to. Well, but, no, I understand the argument you're making, but here there seems to be a very particular focused history given on a particular product and a particular patent. Now, you've said if they reintroduce it, you may or may not sue on that patent, but. But that creates the whole. Well, you do have a particular history here. That's true, but that does create the whole speculation about whether, in fact, if they made the product, we would be having the same case. Let me ask you this. If we were to disagree with the district court, there would still have to be a determination of the traditional declaratory judgment factors, right? That's true. That's true. The court would still have to, would still be in a position to decide whether or not to exercise discretion to hear the case and so forth. Well, but I think the court has already exercised its discretion to dismiss the counterclaims. And so, you know, that's, as you properly point out, that's a matter of discretion. There hasn't been any use of discretion with respect to that. But basically rule on the kind of jurisdictional basis in the case of controversy. Well, he ruled on the jurisdictional basis for our claims against Aspen, and then had the discretion to dismiss the counterclaims, which he received as due. And so he said it was removed. Correct. And considering it may be that when you look at someone's concrete claim, they say, well, you know, we think that we may bring back the same product. It's still, for there to be a controversy, there has to be a fight on both sides. And the court is suggesting, well, the only way for me to eliminate the fight on our side is to have this covenant going even into the future, carry that forward into the future. Do you think it was clear to the district court that your covenant was, that your covenant didn't include them remarketing the exact same product? You were not in that covenant promising not to sue them if they remarketed the same product? Because until you came today, I wasn't sure. And that's why I'm wondering, were those assertions made to the district court? Was it clear? Because I mean, I could have, if you came to me today and said, well, this covenant, we intended it to cover the products that had been the subject of the lawsuit, meaning that we will not sue them if they reintroduce those same products. We're not saying we won't sue them if they reintroduce different products, but those same products are free and clear. And I mean, if you come into me today and said that that is exactly what this language meant, I probably would have said, OK. It wasn't clear to me, but now I understand. And do you think it was clear to the district court? I'm wondering about how he exercised his discretion. When he exercised his discretion, did he really understand what you were agreeing not to do? Because I didn't. I think at 23 and 24 of our appendix, that kind of explains to the court, our briefing to the district court, that that was our intent. And so what I was getting at now is that since we're not, we weren't covenanting into the, oh, sorry. Finish your sentence. What we're getting at now is even though we didn't covenant not to sue in the future, that doesn't mean that we would sue on these same patents in the future. And in order for there to be a case of controversy, there has to be a dispute on both sides of the case. And so it's still speculative as to what we would do in the future because we do have this patent. And so that's part of what should be considered in the totality of the circumstances, what action the plaintiff would take in the future. And it's not automatic that we would sue on this patent in the future since we have so many other options that we might consider. Thank you, Mr. Church. Thank you, Your Honor. Just a couple of points. First, I'd like to address counsel's argument about our motivations. We didn't know this patent existed until we were sued. The product was on the market, and they sued us with a patent. No warning letter, no cease and desist letter, zero. So… But why is that relevant? Because Revolution Counsel says that we went on the market trying to create an infringement suit. Well, if you don't know a patent exists, how can we create an infringement suit? I don't know if you're asking us to make findings. No, we're not. You're just responding to Mr. Church's point. I'm just responding to his argument. And I briefed this, and they have not disputed it until now. This issue of… Mr. Dugan, let me ask you one thing. To pick up on the question I asked of Mr. Trojan, if one were to agree with you on this matter, okay, and say that there is an Article III case of controversy under Medellin, et cetera, okay, what would be the next step? The next step… Go back to the district court for what? For a trial. Okay. For a trial. We were on the lookout steps. What are the next steps? Well, there's… They say we infringed the patent, so there's an infringement claim. If they're saying that they're not going to… that there's no infringement claim anymore, then it's just inequitable conduct and validity. Okay. But if they maintain that and go back, they could sue on infringement, or they could bring an infringement claim, their infringement claim that was dismissed without prejudice would be reinstated, and your inequitable conduct and validity claims would be there. That's correct. In all the pretrial papers that were in the court's hands when we were ready to pick a juror, it had infringement in there, it had all our defenses in there. This issue about, well, we may or may not sue on this patent, maybe on some other patent, that's the problem. That perpetuates the problem and doesn't resolve it. We're sitting there saying, if we introduce this product, what's going to happen to us? This patent, the 913, is the granddaddy patent. All patents flow from that. If this patent goes down due to inequitable conduct, they all go down. This is their broadest patent. They never said in their briefs that they wouldn't sue us, and now they're saying, well, we may, we may not. That just hurts us more. That doesn't give us any comfort. That doesn't resolve the controversy. What they really want us to do on this issue of whether we engaged in any concrete activities, we don't have to call the manufacturer and say, send us 200 samples so they can sit in our warehouse. We don't have to say, here, Revolution, here's our blueprints for this product. We were on the market. It's the same product. The only way this controversy is going to be resolved is if we go to trial in these counterclaims. Thank you. Thank you, Mr. Kudema. Mr. Kudema, please, you still have a minute to finish.